CESARE, APPELLANT AND CROSS-APPELLEE, *v.* WORK ET AL., APPELLEES AND CROSS-APPELLANTS.

(No. 12718—Decided
February 25, 1987.)

*Bruce H. Wilson,* for Robert D.
Cesare.
*Clair E. Dickinson,* for Tom Work
et al.

QUILLIN, P.J. Three of the four
members of the band "Revolver" left
and, together with a fourth musician,
formed the band "1964." Both
Revolver and 1964 performed ex-
clusively Beatles' music. Plaintiff, the
sole remaining member of Revolver,
brought this action pursuant to the
Ohio Deceptive Trade Practices Act,
R.C. Chapter 4165, alleging that
defendants' use of his registered ser-
vice mark "Revolver" and the trade
dress of his band constituted deceptive
trade practices. The trial court found
that defendants engaged in deceptive
trade practices and granted plaintiff a
permanent injunction. Defendants ap-
peal these determinations. The trial
court also found that plaintiff had not
suffered actual damages. Plaintiff ap-
peals the refusal to award damages
and the amount of attorney fees
awarded by the court. We affirm.

Plaintiff, Robert D. Cesare, con-
ceived the idea of forming a band that
created the illusion of a Beatles' con-
cert. His idea was to combine the
minute detail of the Beatles' concert
appearance with the superior sound
the Beatles had achieved in the record-
ing studio rather than merely imitating
a live Beatles' performance. The
Beatles played for only twenty-five to
thirty minutes and rarely talked on
stage. Revolver generally played two

forty-five-minute sets and scripted the show with original dialogue, or banter, among the characters. Revolver, unlike the Beatles, used audience participation to give the show a more intimate appeal. Revolver's song list included songs which were never performed in concert by the Beatles. The Beatles in concert often played shortened versions of songs while Revolver performed versions more closely resembling the album arrangements. Thus, the gist of Cesare's suit is that when the three defendants left Revolver and began performing a substantially identical act, defendants were imitating Revolver's act and not that of the Beatles.

Defendants raise several cross-assignments of error concerning the trial court's finding that defendants engaged in deceptive trade practices. These will be addressed following our review of Cesare's assignments of error.

## Robert Cesare's Assignment of Error I

"Having found that defendants engaged in a deceptive trade practice and thereby destroyed the plaintiff's service mark 'Revolver,' the court erred in finding, that because plaintiff failed to compete, plaintiff was not entitled to his lost profits, and, the court further erred by failing to consider plaintiff's actual damages."

Initially, we note that there is a dearth of case law in Ohio concerning deceptive trade practices. Consequently, where claims are made under Ohio common law and the deceptive trade practices statutes, courts are to apply essentially the same analysis as that applied in assessing unfair competition under the federal statutes. *Jewel Companies, Inc.* v. *Westhall Co.* (N.D. Ohio 1976), 413 F. Supp. 994, 999, affirmed (C.A. 6, 1978), 575 F. 2d 1176. We therefore look to federal law for guidance on those issues not clearly addressed by Ohio case law.

R.C. 4165.03 provides, in part: "A person injured by a deceptive trade practice of another may recover actual damages." R.C. 4165.03 also provides for injunctive relief. Generally, courts grant injunctive relief upon a showing of a "likelihood of confusion." *Carson* v. *Here's Johnny Portable Toilets, Inc.* (C.A. 6, 1983), 698 F. 2d 831; *Frisch's Restaurants, Inc.* v. *Elby's Big Boy of Steubenville, Inc.* (C.A. 6, 1982), 670 F. 2d 642; *Anheuser-Busch, Inc.* v. *Florists Assn. of Greater Cleveland, Inc.* (N.D. Ohio 1984), 603 F. Supp. 35; cf. *Mr. Gasket Co.* v. *Travis* (1973), 35 Ohio App. 2d 65, 64 O.O. 2d 192, 299 N.E. 2d 906. However, in order to award monetary relief, courts generally require "something more," such as evidence of actual losses suffered by the plaintiff or evidence of actual confusion of some customers. *Frisch's Restaurants, Inc., supra* (670 F. 2d), at 647; see, generally, 2 McCarthy, Trademarks and Unfair Competition (2 Ed. 1984) 494, 495-496, Section 30:24 (hereinafter "McCarthy").

A thorough review of the record in this case supports the trial court's finding that Cesare is not entitled to any monetary damages. While Cesare successfully demonstrated a "likelihood of confusion" which justified the imposition of equitable relief (addressed below under defendants' first cross-assignment of error), he presented no evidence of actual confusion of some customers. Cesare presented no evidence that any customers had ever purchased tickets to see 1964, mistakenly believing that they had purchased tickets to see Revolver. Additionally, Cesare presented no evidence that he suffered actual losses in any provable amount. Any harm likely to be caused by defendants' deceptive acts is adequately remedied by the imposition of the permanent injunction.

Under the facts of this case, Cesare has not been "injured" by defendants' deceptive practices such as to sustain actual damages pursuant to R.C. 4165.03.

Cesare's first assignment of error is overruled.

### Robert Cesare's Assignment of Error II

"After having found that the defendants knowingly deceived the public by using the plaintiff's service mark 'Revolver' and elements of his trade dress, the court erred in making an award of attorney's fees based upon an arbitrary assessment."

R.C. 4165.03 provides, in part:

"The court may award reasonable attorneys' fees to the prevailing party. * * * Costs for attorneys' fees may be assessed against a defendant if the court finds that the defendant has willfully engaged in the trade practice knowing it to be deceptive."

The trial court found that defendants willfully engaged in trade practices knowing them to be deceptive, and awarded Cesare attorney fees in the amount of $1,200.

This court has previously held that the allowance of attorney fees is discretionary—not mandatory. *Lozier* v. *Kline* (1973), 40 Ohio App. 2d 277, 284, 69 O.O. 2d 261, 265, 319 N.E. 2d 204, 209. This court has additionally held that in a deceptive trade practices action brought pursuant to R.C. Chapter 4165 the trial court may or may not require the introduction of evidence as to the reasonableness of fees paid, and the appellate court's review of the award is limited to a search for abuse of discretion. *Blankenship* v. *Williams* (Nov. 24, 1976), Summit App. No. 8150, unreported, at 8. In the present case, the record contained sufficient evidence for the court to make an award of reasonable attorney fees. We find no abuse of discretion.

Cesare's second assignment of error is overruled.

### Defendants' Cross-Assignment of Error "A"

"The trial court erred by entering an injunction in this case because plaintiff failed to present any evidence from which the court could conclude that he is 'likely to be damaged' by any activity of the defendants."

R.C. 4165.03 provides for the imposition of an injunction:

"A person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable. Proof of monetary damage or loss or [of] profits is not required. * * *"

To entitle the trade dress of a product to injunctive relief against a deceptive trade practice under R.C. 4165.03, the plaintiff must show that the competing trade dress causes a "likelihood of confusion" on the part of the buying public and that plaintiff's trade dress has acquired a secondary meaning. *Mr. Gasket Co.* v. *Travis, supra; George P. Ballas Buick-GMC, Inc.* v. *Taylor Buick, Inc.* (1982), 5 Ohio App. 3d 71, 5 OBR 182, 449 N.E. 2d 503. We shall examine "secondary meaning" below.

The standard of proof necessary to prevail in an action for injunctive relief is a showing of "likelihood of confusion." *Frisch's Restaurants, Inc., supra* (670 F. 2d), at 647, *Anheuser-Busch, Inc., supra* (603 F. Supp.), at 39. Furthermore, a mere showing that trade practices tend to create a false impression is sufficient to warrant injunctive relief. *Frisch's Restaurants, Inc., supra* (670 F. 2d), at 647. Thus, it is not legally inconsistent to find that there is sufficient evidence of a "likelihood of confusion," yet no evidence of actual confusion.

McCarthy, in his treatise on Trade-

marks and Unfair Competition, notes three evidentiary routes used in proving a likelihood of confusion:

"* * * (1) Survey evidence, (2) evidence of actual confusion; and/or (3) argument based on an inference arising from a judicial comparison of the conflicting marks themselves and the context of their use in the marketplace.

"Under the third route, it would not be necessary for any witness to testify as to instances of actual confusion, for evidence of actual confusion is not necessary to prove a likelihood or probability of confusion. Thus the decision-maker can decide the issue by inspection of the conflicting marks and their manner of use. * * * [T]his is not a subjective judgment as to whether the judge, jury or Trademark Examiner would personally be confused, but rather, whether the ordinary, prudent customer in the marketplace would likely be confused." (Footnotes omitted.) 2 McCarthy, *supra*, at 105-106, Section 23:20.

The Sixth Circuit has considered eight factors relevant to the likelihood of confusion:

"[']1.  strength of the plaintiff's mark;

"[']2.  relatedness of the goods;

"[']3.  similarity of the marks;

"[']4.  evidence of actual confusion;

"[']5.  marketing channels used;

"[']6.  likely degree of purchaser care;

"[']7.  defendant's intent in selecting the mark;

"[']8.  likelihood of expansion of the product lines.['] * * *" *Frisch's Restaurants, Inc., supra* (670 F. 2d), at 648.

The record is replete with evidence of the uniqueness of Revolver, the band started and guided by Cesare. Although Revolver performed Beatles' music, Revolver differed from both the Beatles and other Beatles copy bands in numerous respects. The record shows that Revolver enjoyed success, presumably due, at least in part, to this distinctiveness. Both Revolver and 1964 emulated the Beatles. The trade dress of the two groups at issue in this case, *i.e.*, use of the name "Revolver" or "formerly Revolver," the endorsements and accolades, the advertising packages and folders, and the audience participation and band patter routines, were substantially similar, if not identical. The marketing methods used by both bands were substantially similar. The record contains sufficient evidence from which the trial court could reasonably find that defendants intended to pirate many characteristics from their former band, Revolver. All of these factors contribute to the likelihood of confusion about 1964's association with Revolver.

It is confusion as to the source or origin of the goods which controls on the question of unfair competition. *West Point Mfg. Co.* v. *Detroit Stamping Co.* (C.A. 6, 1955), 222 F. 2d 581, 589. The record contains substantial evidence to support the trial court's comparison of the conflicting trade dress and conclusion that defendants' acts were likely to confuse or deceive the public as to the origin of the band 1964. See 52 Ohio Jurisprudence 2d (1962) 404, Trademarks, Tradenames, and Unfair Competition, Section 100. Given the defendants' reckless disregard for Cesare's rights in the past, the trial court could conclude that nothing short of injunctive restraint would prevent defendants from engaging in deceptive practices in the future. See *Five Platters, Inc.* v. *Purdie* (D. Md. 1976), 419 F. Supp. 372, 384.

Defendants' cross-assignment of error "A" is overruled.

### Defendants' Cross-Assignment of Error "F"

"The trial court erred in enjoining

defendants from using a particular design of advertising materials and from using particular audience participation and/or band member patter because there was no evidence before the court from which it could have found that either the advertising materials used by Revolver or audience participation and band member patter had acquired a secondary meaning that would cause their use by defendants to be deceptive."

To establish the secondary meaning of a trade dress, the plaintiff must show that members of the consuming public associate the trade dress with a particular producer. *Mr. Gasket Co.* v. *Travis, supra.* The product must proclaim its identification with its source, not merely stimulate inquiry about it. *West Point Mfg. Co., supra* (222 F. 2d), at 595. Courts have used various methods of establishing secondary meaning.

" '* * * [S]ource association may be demonstrated by considering the length and manner of use of the trade dress involved, the nature and extent of advertising and promotion of the trade dress, efforts toward promoting a conscious connection in the minds of the public between [the] trade dress and the particular producer, together with competent customer testimony and/or surveys demonstrating the consumer identification of the product source with the trade dress.' " *George P. Ballas Buick-GMC, Inc., supra* (5 Ohio App. 3d), at 73-74, 5 OBR at 185, 449 N.E. 2d at 506, citing *Mr. Gasket Co.* v. *Travis, supra,* paragraph three of the syllabus.

The trade dress of the band Revolver *was* the performance. The trade dress was in use for about three years. The ensemble of the instruments, the stage setting, outfits, song list, delivery, character interpretation, and choreography of the audience participation and band member patter together proclaimed the identity of the source. That source was the band Revolver; and Robert Cesare was substantially responsible for Revolver's performance. Revolver received promotion from nationally recognized sources. Stories about Revolver appeared in major newspapers and on television. Cesare presented testimony of Revolver's popularity and reputation. The record contains sufficient evidence for the trial court to conclude that the consuming public knew who performed the show Revolver and chose this particular rendition of the Beatles' music because of the unique characteristics of Revolver's performance. These characteristics include particular audience participation and band member patter. The design of the advertising materials, the promotional packages, should not be denied protection against unfair trade practices merely because it is an element of the performance unseen by most of the consuming public.

It has also been held that secondary meaning can be sufficiently proven by the inferences to be drawn from copying. *Mr. Gasket Co.* v. *Travis, supra,* at 71, 64 O.O. 2d at 195, 299 N.E. 2d at 912, fn. 10; *My-T Fine Corp.* v. *Samuels* (C.A. 2, 1934), 60 F. 2d 76; see discussion at 1 McCarthy, *supra,* at Sections 8:2 and 15:4. McCarthy explains that the reason this view does not fit into the mainstream of trademark law is that it is not "trademark law" but is "unfair competition law" in the sense that it deals with "unfair" conduct that happens to relate to some symbol or trade dress that plaintiff uses that is not a trademark. 1 McCarthy, *supra,* at Section 15:5.

The record contains a detailed comparison between the promotional kits and the performances of the two groups as well as admissions by the one defendant who testified that many

details of the performances, including the band member patter, were similar in almost every detail, and that he "got some help" from Revolver's package while preparing the promotional package for 1964. A logical inference to be drawn from the totality of the evidence, and an inference substantially supported by the record, is that defendants intentionally copied many elements of Revolver's show, including the promotional kits, the audience participation and the band member patter.

Cases analyzing unfair trade practices in the context of literary and artistic productions provide some insight applicable in the context of this case. In *Jackson* v. *Universal Internatl. Pictures, Inc.* (1950), 36 Cal. 2d 116, 222 P. 2d 433, the California Supreme Court held that even a few performances of a little-known play were sufficient to establish secondary meaning. The court also held that the title of a play performed in New York and Philadelphia, and publicized in those cities as well as Los Angeles, may acquire secondary meaning entitling it to protection throughout the United States. The essence of the acquisition of secondary meaning is the impact upon the public mind:

"* * *[I]f words have been used by an author or manufacturer in such a manner that the public has learned to associate them with the product, book or play, they acquire a 'secondary meaning.' * * *" *Jackson* v. *Universal Internatl. Pictures, Inc., supra* (36 Cal. 2d) at 121, 222 P. 2d at 436.

In *Internatl. Film Service Co., Inc.* v. *Associated Producers, Inc.* (S.D.N.Y. 1921), 273 F. 585, Judge Learned Hand found that a single publication in a magazine so broadly circulated as Cosmopolitan would normally be sufficient exposure for public recognition. He found that the story presumptively had many readers, of whom a substantial number remember the title. The court held that presump-

tions form the basis for an honest inference in the absence of adequate information.

Utilizing any of these guidelines, or a combination of all of these guidelines, Cesare met his burden of proof on the issue of secondary meaning. It is well-settled that one who pirates "a mark similar to the mark of another for closely related goods acts at his peril and any doubt * * * must be resolved against him. * * *" *Carlisle Chemical Works, Inc.* v. *Hardman & Holden Ltd.* (C.C.P.A. 1970), 434 F. 2d 1403, 1405.

Defendants' cross-assignment of error "F" is overruled.

### Defendants' Cross-Assignment of Error "D"

"The trial court erred by finding that plaintiff is entitled to protected use of the name 'Revolver.' "

Defendants claim that once Cesare ceased his efforts to reform the band Revolver, he abandoned his right to protected use of the name "Revolver." Rights in a trademark may be lost by abandonment. Annotation, Abandonment of Trademark or Tradename (1949), 3 A.L.R. 2d 1226, 1232, Section 3. However, to establish the defense of abandonment, it is necessary to show an actual intent to abandon. *Saxlehner* v. *Eisner & Mendelson Co.* (1900), 179 U.S. 19, 31.

A period of non-use may be evidence from which an intent to abandon may be inferred, depending upon the length of such non-use, the cause of it and other relevant factors. *Baglin* v. *Cusenier Co.* (1911), 221 U.S. 580. However, it is not the law that "the slightest cessation of use causes a trade-mark to roll free, like a fumbled football, so it may be pounced upon by any alert opponent. * * *" (Footnote omitted.) *Continental Distilling Corp.* v. *Old Charter Distillery Co.* (C.A.D.C.

1950), 188 F. 2d 614, 619. In *Beech-Nut Packing Co.* v. *P. Lorillard Co.* (1927), 273 U.S. 629, 632, Justice Holmes found that the non-use of a trademark for five years did not constitute abandonment, stating:

"* * *The mere lapse of time was not such that it could be said to have destroyed the right as [a] matter of law. A trade-mark is not only a symbol of an existing good will, although it commonly is thought of only as that. * * * [T]he fact that the good will once associated with it has vanished does not end at once the preferential right of the proprietor to try it again upon goods of the same class with improvements that renew the proprietor's hopes."

Because abandonment results in a forfeiture of rights, courts are reluctant to find abandonment. See, generally, 1 McCarthy, *supra,* at Section 17:3. Defendants argue that Cesare presented no evidence that he intended to use the trademark in the future. The burden is upon defendants, however, to show by clear and convincing evidence not only acts indicating practical abandonment, but an actual intent to abandon. *Saxlehner, supra* (179 U.S.), at 31.

Defendants failed to meet their burden of proving that Cesare abandoned his rights in the name "Revolver." While Cesare testified that he had ceased advertising for new band members about a year before trial, he explained that he did so because of defendants' continued violation of the preliminary injunction. Cesare also testified that while he had stopped placing ads, he did still talk to some people about it. The passage of such a short time, absent other substantial evidence of intent to abandon, falls short of the quantum necessary to prove abandonment.

Defendants' cross-assignment of error "D" is overruled.

Defendants' Cross-Assignment
of Error "E"

"The trial court erred by finding that certain 'Band Patter Routines' were developed by plaintiff when there was no evidence to support that finding."

The trial court found that defendants "used audience participation and band patter routines developed by the plaintiff which were uniquely those of Revolver and contributed to the deception of the audience." The trial court therefore permanently enjoined defendants from using "any audience participation and/or band-member patter (such as used in the song Long Tall Sally) written by Robert Cesare and used by Revolver." Defendants argue that Cesare's testimony indicating that all the members of Revolver had a part in composing the band patter and the fact that Cesare never federally registered the patter precluded the trial court from protecting Cesare's interest therein.

Although Cesare conceded that all of the band members contributed to the composition of the band patter, extensive testimony was presented to the trial court concerning Cesare's role in creating and coaching the band. The trial court had sufficient evidence to conclude that Cesare at least had the final word in what band patter consisted of. However, any error in the trial court's finding that the band patter was developed by or written by Cesare was harmless. The focal point of the trial court's finding and order was that the band patter routines were "uniquely those of Revolver" and "used by Revolver."

Trademark rights are not acquired by registration; the right to a trademark stems from prior appropriation and use. See, *e.g., Haviland & Co.* v. *Johann Haviland China Corp.* (S.D. N.Y. 1967), 269 F. Supp. 928, 935; gen-

erally, 1 McCarthy, *supra*, at Section 19:4.

"It is a fundamental rule applicable to all cases of unfair competition that one man has no right to palm off his goods for sale as the goods of a rival dealer, and that he cannot, therefore, be allowed to use names, letters, or other indicia by which he may induce purchasers to believe that the goods which he is selling are the manufacture of another; and this principle is applicable although no technical trademark is used by either. * * *" *West Point Mfg. Co., supra* (222 F. 2d), at 586.

The band member patter was developed under the auspices of the band Revolver. Revolver exclusively appropriated and used particular compositions of band member patter. The Revolver performance, which consisted of the band member patter along with other distinctive characteristics developed for the band Revolver, had acquired a secondary meaning entitling those characteristics to protection.

"[I]f a constellation of characteristics has acquired a secondary meaning, *i.e.*, a distinctive trade dress, an interest is created which a state can act to protect in order to prevent the likelihood of consumer confusion as to source * * *." (Footnote omitted.) *Mr. Gasket Co.* v. *Travis, supra,* at 71-72, 64 O.O. 2d at 195-196, 299 N.E. 2d at 912.

The performance of Revolver was not personal to the performers, but identified and distinguished a style and rendition of Beatles' music continuously controlled by the manager-musical director (Cesare) as different performers left and were replaced. See *Five Platters, Inc.* v. *Purdie, supra* (419 F. Supp.), at 387-389. Therefore, Cesare, as the manager and director of Revolver, as the only member of Revolver currently, and as the holder of the federally registered trademark in the name "Revolver," is entitled to protection against unfair trade practices committed against the trademark and trade dress.

Defendants' cross-assignment of error "E" is overruled.

## Defendants' Cross-Assignments of Error "B" and "C"

"B. The trial court erred by receiving, over objection, hearsay evidence in the form of newspaper clippings and an unauthenticated audio tape.

"C. The trial court erred by finding that defendants referred to 1964 as 'Formerly Revolver' when there was no admissible evidence of them ever having done so."

The trial court found that "defendants billed and advertised themselves as 'formerly Revolver.' " This finding was followed by "See plaintiff's Exhibits 9, 12 and 14." Defendants objected to the introduction of Exhibits 9 and 14. Exhibit 9 is a collection of newspaper articles which basically refer to "1964" as being formerly known as "Revolver." Exhibit 14 is an audiotape recording of a pre-recorded message playing at a club where 1964 was to perform. The pre-recorded message identified 1964 as being "formerly Revolver." The trial court admitted both exhibits over defendants' objection.

Hearsay is offered in evidence to prove the truth of the matter asserted. Evid. R. 801(C). However, Cesare was not attempting to prove that 1964 was formerly Revolver. The evidence was also admissible as a hearsay exception to show the state of mind of the declarant. Evid. R. 803(3); *Armco, Inc.* v. *Armco Burglar Alarm Co.* (C.A.5, 1982), 693 F. 2d 1155, 1160, fn. 10. Defendants contend that the trial court did not limit its use of the two exhibits to the narrow issue of whether the public was confused. This was a bench trial. "Considering testimony for some and not other purposes is daily fodder

in the trial court." *Armco, Inc., supra* (693 F. 2d), 1160, at fn. 10.

The record also discloses evidence from which the trial court could find that defendants acquiesced in the identification of 1964 as formerly Revolver. The basis of unfair trade practice law is that a junior user has a duty to take whatever steps are reasonable and necessary to prevent the confusion of his product with that of a senior user. *Crescent Tool Co.* v. *Kilborn & Bishop Co.* (C.A. 2, 1917), 247 F. 229, 301. We find no prejudicial error.

Defendants' cross-assignments of error "B" and "C" are overruled.

### Defendants' Cross-Assignment of Error "G"

"The trial court erred in finding that defendants violated subsections (A), (B), (C), and (E) of Section 4165.02 of the Ohio Revised Code."

The trial court found that defendants had violated R.C. 4165.02 (A), (B), (C) and (E). R.C. 4165.02 provides, in relevant part:

"A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:

"(A)  Passes off goods or services as those of another;

"(B)  Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

"(C)  Causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;

"* * *

"(E)  Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have[.]"

Except as otherwise argued by separate assignments of error, defendants did not address this assignment of error. We may, therefore, disregard it. App. R. 12.

### Defendants' Cross-Assignment of Error "H"

"The trial court erred in entering an injunction of unlimited geographic scope in this case when the evidence before it was that the band Revolver seldom performed outside Ohio and never performed in most of the places that 1964 performs."

Cases have given widely disparate treatment to the determination of the proper geographic scope of protection. See, generally, 2 McCarthy, *supra,* at Chapter 26; Annotation (1972), 41 A.L.R. 3d 434. However, the cases are virtually unanimous against a junior user who knowingly adopted the senior user's mark. *Pike* v. *Ruby Foo's Den, Inc.* (C.A.D.C. 1956), 232 F. 2d 683, 686; *Johanna Farms, Inc.* v. *Citrus Bowl, Inc.* (E.D.N.Y. 1978), 468 F. Supp. 866, 876 ("If it is found that the junior user did not adopt the mark in good faith, he will not be accorded the right to exploit the mark, even in areas previously untouched by the senior user."); Note, Developments in the Law — Trademarks and Unfair Competition (1955), 68 Harv. L. Rev. 814, 858.

Defendants knowingly and willfully engaged in deceptive trade practices. Because knowledge is an independent element from the remoteness of plaintiff's use, defendants' knowledge destroys the defense.

We note also that Revolver had performed on national television. National advertising is arguably sufficient to support a nationwide injunction even in the absence of the junior user's bad faith.

Defendants' cross-assignment of error "H" is overruled.

The judgment of the trial court is affirmed.  *Judgment affirmed.*

BAIRD and GEORGE, JJ., concur.